Filed 5/16/23  P. v. Dupuis CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080608 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE406489) |
| GERALD LEE DUPUIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel Lamborn, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

At 4:00 a.m. one morning in May 2021, Gerald Dupuis aka Gerald Durvis[1] (Dupuis) broke into an attached residential garage, created a substantial mess inside it, stole a knife, and then doused the outside of the house with lighter fluid. When the residents awoke, they confronted Dupuis at gunpoint and called the police. Dupuis provided the responding officers with a false name and date of birth. Throughout his interactions with the residents and the officers, Dupuis frequently spoke incoherently, and one officer believed Dupuis was under the influence of drugs.

A jury convicted Dupuis of first degree residential burglary (Pen. Code[2], § 459; count 1)[3], attempted arson (§455; count 2), possession of flammable material (§ 453, subd. (a); count 3), and giving false information to a peace officer (§ 148.9, subd. (a); count 4). The trial court sentenced him to four years and eight months in prison.

On appeal, Dupuis argues there is insufficient evidence he possessed the specific intent necessary to support his convictions, and that the trial court erroneously and prejudicially declined to instruct the jury that he had a possible mental disorder that could negate the specific intent element of the charged offenses. Viewing the evidence in the light most favorable to the jury

---

[1]     Although the People filed this action under the name "Gerald Lee Durvis," Appellant's counsel informed the trial court that his true name is Gerald Dupuis, and Appellant listed the same as his name on his notice of appeal.

[2]     Further undesignated statutory references are to the Penal Code.

[3]     The jury also found true allegations that the burglary was of an inhabited dwelling house (§ 460, subd. (a)) and that another person was present in the residence during the burglary (§ 667.5, subd. (c)(21)).

2

verdict, we conclude substantial evidence supports the jury's finding that Dupuis acted with the requisite specific intent in committing his crimes. We further conclude that the evidence did not warrant instructing the jury on mental impairment. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Kristy S. awoke at 4:00 a.m. one morning in May 2021 to let her dog out to relieve himself in the backyard. The dog began barking and Kristy looked out her front window to see Dupuis standing behind her father's pickup truck in the driveway, with the tailgate open, apparently reading a bottle. Kristy's father stored chainsaws, weedwhackers, and other tools in the truck, but did not lock the tailgate and shell. He had recently purchased, but not opened, a bottle of lighter fluid and left it in his truck.

Kristy panicked and ran down the hall to wake her fiancé, Nicholas M. Nicholas retrieved a gun he kept in a locked box in the closet and they both went out the front door and around to the driveway.

When they reached the front yard, they saw Dupuis spraying the house with a bottle of lighter fluid. Kristy and Nicholas recognized the lighter fluid by its smell. Nicholas shouted for Dupuis to drop the bottle and get on the ground. Dupuis immediately dropped the bottle and sat on the curb. While Nicholas pointed his gun at Dupuis, Kristy called the police. Kristy told the operator, "I don't know what's wrong with him, [he's] acting kind of funny."

As they stood waiting for the police, Kristy noticed that a knife with a mermaid on the handle that she normally kept on a shelf in the back of the garage had fallen out of Dupuis's pocket. Nicholas kicked it away from Dupuis. Meanwhile, Kristy's father, who lived next door, heard the noise and came outside as well.

3

Kristy then looked in her garage, which she described as "a disaster." The rollers of the main door were off their tracks, and her father noted that the garage door sensors were broken. Kristy was certain she had closed the garage door the night before. Her belongings, which normally were put away in cabinets and on shelves, had either been thrown into the center of the garage or moved. She found all her laundry supplies in a sink, soaked with water. When she opened the washing machine, she discovered that the hinge was broken and it was full of drywall powder and bug repellent, along with other substances from her garage. The dryer hinges were also broken.

A large sheet of plastic had been placed over the door to the backyard and the refrigerator had been moved to block the door. All of the food from the refrigerator was scattered around the garage floor and a plastic container filled with children's goggles and nuts and bolts from her father's backyard had been added to the refrigerator. She found an empty beer bottle on the floor and a large, empty vodka bottle behind the dryer near a puddle that smelled like vodka. She and Nicholas also discovered a pool of gasoline on the garage floor from a nearby gasoline canister Nicholas used for his motorcycle.

The bottom lock on the door leading from the garage to the kitchen had been picked, and Kristy found a knife she did not recognize on the step below. Kristy had locked both that lock and the deadbolt above it the night before, but only the deadbolt remained locked.

When police arrived, Dupuis picked up the mermaid knife and threw it as an officer approached. One officer then searched Dupuis while the other questioned him. In his pockets, Dupuis had three lighters, a book of matches, a small screwdriver, a flashlight, a carabiner, some money, trash, and an air compressor attachment. The officers collected as evidence the lighter fluid

4

bottle, which stated on the label: "Expert grill lighter fluid. Easy to start, clean burning, danger, combustible."

Dupuis first identified himself as "Brian Dupuis" and falsely said his birthday was February 20. He then provided a birthday of November 21. (Dupuis stipulated his true date of birth is August 1.) After identifying him from the photo identification in his pocket, the officers learned he had an active arrest warrant. An officer noted that Dupuis was sweating, had urine in the crotch of his pants, had uncontrollable body movements, and was rambling unintelligibly. Bodyworn camera footage from one of the officers showed that, during questioning, Dupuis said, "I work for the atmosphere, bro. I don't have drugs. I don't have needles. I don't have weapons." As to why he was at the property, he first said he was "sleepwalking or something" and later said, "I don't even know how I got here."

At trial, an officer testified that throughout their contact with him, Dupuis made unintelligible statements, had difficultly responding to questions, and was often incoherent. Another officer described symptoms common to methamphetamine users, testified that he encountered people under the influence of methamphetamine almost every day, and said he suspected Dupuis of being under the influence of drugs. However, the officers did not test Dupuis for drugs or alcohol. Counsel stipulated that Dupuis was in possession of spice, a synthetic cannabis, upon arrest.

Kristy opined that it would have taken three to four hours to make this great a mess, and she said it took her and Nicholas two days to clean it up. The mixture in the washing machine was still wet when they discovered it, so they were able to scoop it out before it hardened and clean the machine. Although the hinges remained broken on both the washer and dryer, they

were operable.  Her father repaired the garage door and found the new bottle of lighter fluid from his truck was missing after the incident.

DISCUSSION

I.

*Substantial Evidence Supports Dupuis's Convictions*

Dupuis's first claim on appeal is that the evidence was insufficient to demonstrate he had the requisite specific intent to support his convictions. Pointing to testimony and bodyworn camera footage of his irrational behavior and incoherent speech, Dupuis argues his mental state during the incident was "inconclusive" at best and that the evidence shows he did not have any intent whatsoever.  Accordingly, he contends the People failed to prove beyond a reasonable doubt that he had the specific intent required by each of the four counts.  We disagree.

Our consideration of this claim is governed by the following principles. When considering a challenge to the sufficiency of evidence supporting a conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 (*Johnson*); see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  "We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses."  (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 42 (*Jacobo*); *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  The question is not whether we believe the evidence established the defendant's guilt beyond a reasonable doubt, but whether " ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' "  (*People v. Kelly* (1990) 51 Cal.3d

6

931, 956.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

The primary thrust of Dupuis's argument is that his bizarre behavior and incoherent statements created a reasonable inference that he lacked the requisite specific intent and that, when faced with two reasonable inferences, one of which pointed to innocence, the jury was required to acquit. On this basis, Dupuis asserts that the trial court should have granted his motion to dismiss the charges, and that we should reverse the convictions.

While Dupuis is correct that " ' "it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence" ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87), once the jury has decided that the defendant is guilty beyond a reasonable doubt, the reviewing court may not reweigh the evidence or reevaluate the credibility of witnesses (*Jacobo, supra,* 37 Cal.App.5th at p. 42). " 'Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*Manibusan,* at p. 87.) It is through this lens that we evaluate whether the direct and circumstantial evidence presented at trial reasonably justified the jury's conclusion that Dupuis demonstrated the specific intent necessary for conviction on each count.

For count 1, the trial court properly instructed the jury that to find Dupuis guilty of first degree burglary, it had to find that he entered an inhabited dwelling house with the "inten[t] to commit theft or felony vandalism." (See *People v. Ramirez* (2006) 39 Cal.4th 398, 463 ["A burglary is

7

committed if the defendant enters a residence or other enumerated structure 'with intent to commit grand or petit larceny or any felony' "].) The jury did not have to agree as to which crime he intended to commit at the time of entry. Nor did they have to find that Dupuis actually committed theft or felony vandalism after entry.

The court further instructed the jury that theft by larceny (§ 484) required proof that Dupuis took possession of property owned by someone else, without the owner's consent, and with the intent to deprive the owner of the property permanently. The jury also had to find that "[t]he defendant moved the property, even a small distance, and kept it for any period of time, however brief." The vandalism instruction (§ 594) compelled the People to prove Dupuis "maliciously damaged or destroyed real or personal property"[4] and did not own the property. While property of any value satisfied the theft crime, the amount of damage caused by vandalism had to be at least $400.

Having reviewed the record as a whole in the light most favorable to the judgment below (*Johnson, supra,* 26 Cal.3d at p. 578), we conclude that the trial evidence of specific intent for count 1 was sufficient to satisfy the deferential substantial evidence standard of review. " ' "While the existence of the specific intent charged at the time of entering a building is necessary to constitute burglary in order to sustain a conviction, this element is rarely susceptible of direct proof and must usually be inferred from all of the facts and circumstances disclosed by the evidence." ' " (*People v. Holt* (1997) 15 Cal.4th 619, 669; *People v. Johnson* (2019) 32 Cal.App.5th 26, 58.) Nonetheless, " '[s]ubstantial evidence includes circumstantial evidence and

_____

[4] Pursuant to the vandalism instruction "[s]omeone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone else."

8

the reasonable inferences flowing therefrom' [citation], and ' "circumstantial evidence is as sufficient as direct evidence to support a conviction." ' " (*People v. Myles* (2023) 89 Cal.App.5th 711, 739 (*Myles*).)

The People argued at trial that Dupuis's intent to burglarize the home is demonstrated by the fact that he pried open the garage door, did so under the cover of darkness, and brought tools such as a screwdriver and a flashlight. They contend his intent to commit theft specifically is evident from the fact that he picked one of the locks leading to the interior of the house and obscured the window on the back door of the garage to hide his actions. In the People's view, the reason Dupuis then poured out the contents of nearly every container in the garage is because he was going through everything looking to steal whatever items he could find. And, given that he ultimately took Kristy's mermaid knife, credible evidence supports this interpretation.

The defense offered a different view of the evidence. Defense counsel argued in her closing statement that the fact that Dupuis left the lights on, stayed in the garage for several hours, and presumably made a great deal of noise indicated that he was "not all there." In particular, she submitted that dumping out every single liquid he could find demonstrated that Dupuis did not have a plan or intent at all. But the jury may reasonably have disagreed with this summation of the facts given that Dupuis did *not* dump the lighter fluid on the ground, but rather sprayed it all over the side of the house.

Even if "the evidence of [the] defendant's guilt . . . is not overwhelming," we may not disturb the verdict on appeal " ' "[w]hen the evidence justifies a reasonable inference of felonious intent." ' " (*People v. Cain* (1995) 10 Cal.4th 1, 47.) On this record, we conclude the jury could

9

reasonably have rejected the defense argument and concluded Dupuis had the specific intent to commit theft when he entered the garage.

The record also contained credible evidence that Dupuis entered the home intending to vandalize it. This, again, required a finding that he intentionally did a wrongful act or intended to annoy or injure someone else. (§ 594.) In this case, Dupuis poured drywall powder into the washing machine and mixed it with liquids that activated the powder and caused it to begin solidifying. Although Kristy testified she discovered the mess in time to scoop it out and clean the drum before it hardened and completely destroyed the washing machine, she indicated that it took her a long time to clean. A jury could reasonably conclude this was done with the intent to annoy the owner. Dupuis also cracked the door hinges on both the washer and the dryer and, although they are still usable, Kristy estimated it would cost "a couple thousand dollars" to replace both. Thus, while Dupuis may not have succeeded in destroying Kristy's washer due to her quick response, a jury could find that his actions in mixing the drywall powder with liquid within the washer evinced a specific intent to vandalize property within the home. (See *People v. Allen* (1999) 21 Cal.4th 846, 863, fn. 18 ["*entry* with the proscribed intent . . . constitutes the completed crime of burglary 'regardless of whether . . . any felony or theft actually is committed' "].) Accordingly, we conclude sufficient evidence supported the jury's finding that Dupuis entered the home with the specific intent necessary to affirm the burglary conviction.

As for the attempted arson in count 2 (§ 455), the court instructed the jury that to find Dupuis guilty of the charge, it must find that he "willfully and maliciously" "place[d] any flammable, explosive, or combustible material or device in or around [the structure or property], with the intent to set fire to it." In this case, Dupuis sprayed lighter fluid all over the side of an inhabited

10

home and was found to have three lighters and a book of matches in his pocket. The jury could reasonably infer that Dupuis understood what the bottle contained because its label stated: "Expert grill lighter fluid. Easy to start, clean burning, danger, combustible." And Kristy testified that he stood and looked at the bottle before spraying it. As discussed above, he also specifically doused the house with the lighter fluid as opposed to just dumping it on the ground with some of the other fluids in the garage. Collectively, this constitutes credible evidence based upon which a reasonable trier of fact could find the defendant guilty of attempted arson beyond a reasonable doubt. (*Johnson, supra,* 26 Cal.3d at p. 578.)

The same is true for count 3, possession of an incendiary device or flammable material. As instructed, the jury had to find that Dupuis possessed an incendiary device and "willfully and maliciously intended to use the material or device to set fire to or burn a structure or property." Again, " '[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' " (*People v. Johnson, supra,* 32 Cal.App.5th at p. 58.) There is no dispute Dupuis possessed incendiary devices; namely, three lighters and a book of matches. When coupled with his actions of apparently reading the lighter fluid bottle and then spraying it onto the house, a strong inference arises that Dupuis intended to set fire to the home. Though circumstantial, this evidence is sufficiently substantial to support the conviction. (See *Myles, supra,* 89 Cal.App.5th at p. 739.)

Finally, we turn to count 4, giving false information to a peace officer. The specific intent element of this crime required that, when falsely identifying himself to a peace officer who was conducting a lawful detention or arrest, Dupuis "intended to evade . . . proper identification of the

11

defendant by the . . . investigating peace officer."  The People presented bodyworn camera footage showing Dupuis identifying himself as "Brian Dupuis" and claiming he had his brother's identification on him.  He then gave two different birthdates, neither of which was true.  Given that the officers subsequently determined that Dupuis had an active arrest warrant, this evidence supports the logical inference urged by the prosecution that Dupuis lied about his identity to evade arrest.  (See *People v. Maury* (2003) 30 Cal.4th 342, 396 ["An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence"].)  On this basis, we conclude a reasonable trier of fact could have found Dupuis guilty of giving false information to a peace officer beyond a reasonable doubt. (*Johnson, supra,* 26 Cal.3d at p. 578.)

In addition to the evidence supporting conviction on each of the counts, we find additional evidence in the record refuting Dupuis's overarching contention that he was so impaired by drugs or mental illness that he was unable to form any of the requisite intents.  For example, although both officers testified that Dupuis made unintelligible statements and one officer indicated he believed Dupuis was under the influence of methamphetamine, Dupuis still had the wherewithal to answer the questions asked and volunteer relevant information such as "I don't have drugs" and "I don't have weapons."  His subsequent statement, "I wasn't in the property, I didn't do any crime," further supports a reasonable inference that he was capable of understanding he had done something wrong and specifically tried to avoid being held accountable.  The fact that he threw the stolen mermaid knife away as officers approached also supports this inference.  Accordingly, we reject Dupuis's sufficiency of the evidence challenge to all four counts.

II.

*The Trial Court Was Not Required to Instruct with CALCRIM No. 3428*

Dupuis's second claim is that the trial court erroneously and prejudicially declined to instruct the jury that he had a possible mental disorder that negated the specific intent element of the charged offenses. We independently review challenges based on a trial court's failure to instruct on a defense. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.) Having done so, we conclude the court did not err.

The trial originally was scheduled for August 2021, but the court vacated it the month before and suspended proceedings pursuant to section 1368 so that Dupuis could undergo a mental competency examination. In February 2022, the court found Dupuis mentally competent to stand trial and reinstated the proceedings. No evidence related to this examination, or any subsequent diagnoses, was presented to the jury.

Dupuis's counsel requested that the court instruct the jury on mental impairment to negate the specific intent element of the charged offense (CALCRIM No. 3428). CALCRIM No. 3428 instructs, in relevant part, as follows: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime."

The People objected, arguing that the instruction was inappropriate because the evidence before the jury did not establish that Dupuis had been diagnosed with a mental illness. In response, the defense pointed to evidence

13

from multiple witnesses that Dupuis was unintelligible and incoherent at the time of the incident and that police did not drug test him.

The court acknowledged that evidence had been presented consistent with the conclusion that Dupuis had been under the influence. But it concluded the jury had not heard substantial evidence showing that these same symptoms indicated that Dupuis had a mental disorder, defect, or disease. Further, in reading the use notes for CALCRIM No. 3428, the court noted that they discussed expert testimony, which was not offered in this case. The court denied the defense's request for the instruction on this basis.

CALCRIM No. 3428 "is a pinpoint instruction that must be given only if requested by the defendant, and only if substantial evidence supports the defense theory that defendant's mental disease or disorder affected the formation of the relevant intent or mental state. [Citation.] Also, expert medical opinion testimony is necessary to establish that a defendant suffered from a mental disease, mental defect, or mental disorder within the meaning of CALCRIM No. 3428, because jurors cannot make such a determination from common experience." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 824 (*Larsen*).)

Here, Dupuis did not offer expert testimony regarding any mental disease, defect, or disorder, nor did he introduce any other evidence that he suffered from a specific mental disorder or impairment at the time of the offenses. Although the court initially questioned his mental competency, Dupuis was declared competent to stand trial and no evidence regarding the examination or resultant findings in connection with the section 1368 proceedings was presented to the jury. The only evidence of unusual behavior before the jury was Kristy's testimony that Dupuis was "acting kind of funny," the police officers' testimony that Dupuis was unintelligible, and

14

bodyworn camera footage showing Dupuis claiming to "work for the atmosphere." However, no evidence tied this behavior to a mental impairment of any kind.

In determining whether instruction is warranted, " 'the test is not whether *any* evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that "deserve[s] consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [people] could have concluded' " ' that the specific facts supporting the instruction existed." (*Larsen, supra,* 205 Cal.App.4th at p. 824.) Absent expert testimony that Dupuis even suffered from a mental disorder, no specific facts supported the instruction. Given this record, we conclude that the trial court did not err in finding that no substantial evidence supported instructing the jury on mental impairment. Because we find no legal error, we need not analyze prejudice.

DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

15